### In re LUCENT TECHNOLOGIES, INC., SECURITIES LITIGATION.

No. CIV.A. 00–621(AJL).

United States District Court, D. New Jersey.

April 26, 2000.

---

Robert A. Hoffman, Samuel R. Simon, Barrack, Rodos & Bacine, Haddonfield, Daniel E. Bacine, Barrack, Rodos & Bacine, Philadelphia, PA, David Bershad, Steven G. Shulman, Samuel H. Rudman, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, Sandy Liebhard, Bernstein, Liebhard & Lifshitz, LLP, New York City, Robert Berg, Mel E. Lifshitz, Bernstein, Liebhard & Lifshitz, Fort Lee, Stuart Wechsler, Samuel K. Rosen, Wechsler, Harwood, Halebian & Feffer, Fred T. Isquith, Michael Jaffe, Wolf, Haldenstein, Adler, Freeman & Herz, New York, NY, Andrew M. Schatz, Jeffrey S. Nobel, Schatz & Nobel, P.C., Hartford, CT, Jack G. Fruchter, Fruchter & Twersky, New York, NY, Paul Geller, Jonathan M. Stein, Shepherd & Geller, Boca Raton, FL, Marc Henzel, Law Offices of Marc Henzel, Philadelphia, PA, James V. Bashian, Law Offices of James V. Bashian, New York City, Mark Topaz, Schiffrin & Barroway, Ltd., Bala Cynwyd, PA, Frederic S. Fox, Kaplan, Kilsheimer & Fox, New York City, William J. Pinilis, Kaplan, Kilsheimer & Fox, LLP, Morristown, David B. Kahn, David B. Kahn & Associates, Northfield, IL, Marvin L. Frank, Rabin & Peckel, New York, NY, Barbara A. Podell, Savett, Frutkin, Podell & Ryan, Philadelphia, PA, Curtis V. Trinko, Law Offices of Curtis V. Trinko, LLP, Robert Susser, Law Offices of Robert Susser, P.C., New York City, Brian Barry, Law Offices of Brian Barry, Los Angeles, CA, Jules Brody, Stull, Stull & Brody, Peter D. Bull, Joshua M. Lifshitz, Esq., Bull & Lifshitz, LLP, Robert N. Cappucci, Entwistle & Cappucci LLP, New York City, Brian Felgoise, Law Offices of Brian Felgoise, Philadelphia, PA, Peter Fishbein, Law Offices of Peter Fishbein, Hasbrouk Heights, Gary S. Graifman, Kantrowitz, Goldhamer & Graifman, Montvale, Harvey Greenfield, Law Offices of Harvey Greenfield, New York, NY, Andrew R. Jacobs, Fitzsimmons, Ringle & Jacobs, Allyn Z. Lite, Joseph J. DePalma, Lite, DePalma, Greenberg & Rivas, LLC, Newark, Charles J. Piven, Law Offices of Charles J. Piven, Baltimore, MD, Joseph E. Saul, Gellerstein & Saul, Teaneck, Joseph H. Weiss, Weiss & Yourman, New York, NY, for Plaintiffs.

Paul C. Saunders, Robert H. Baron, Ilana B. Chill, Cravath, Swaine & Moore, New York City, John H. Schmidt, Jr., Lindabury, McCormick & Estabrook, Westfield, for Defendants.

## OPINION

LECHNER, District Judge.

This is an action for securities fraud brought on behalf of purchasers of Lucent Technologies, Inc. ("Lucent") common stock ("Lucent Stock"), seeking damages for violations of Section 10(b)("Section 10(b)") and 20(a) ("Section 20(a)") of the Securities Exchange Act of 1934 (the "Exchange Act"), as

amended, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10–b ("Rule 10–b") promulgated thereunder, 17 C.F.R. § 240.10b–5. Damages are sought from Lucent, Richard A. McGinn ("McGinn") and Donald Peterson ("Peterson") (collectively, the "Defendants"). Jurisdiction is alleged pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

Presently pending are motions for the appointment of lead plaintiffs (the "Lead Plaintiffs Motion") and approval of the selection of lead counsel (the "Lead Counsel Motion"), pursuant to § 21D(a)(3)(B) of the Exchange Act, as amended, 15 U.S.C. § 78u–4(a)(3)(B). The Lead Plaintiffs Motion and the Lead Counsel Motion were filed on behalf of Employer–Teamsters Locals 175 & 505 Pension Trust Fund (the "Pension Trust Fund"), Huisuk Clevenger ("Clevenger") and Marc Altman ("Altman")(the "Proposed Lead Plaintiffs") by both the Proposed Lead Plaintiffs and certain other class members (collectively, the "Movants")[1] representing the purchase of more than 700,000 shares of Lucent Stock.[2]

For the reasons explained below, the Lead Plaintiffs Motion is denied in part, and provisionally granted in part; the Lead Counsel Motion is denied.

*Facts*[3]

A. *The Defendants*

Lucent is a Delaware corporation with its principal place of business and offices located at Murray Hill, New Jersey. Lucent is a designer, builder and installer of public and private networks, communications systems and software, data networking systems, business telephone systems, and microelectronics components. Lucent also engages in the manufacture of integrated circuits and opteoelectronic components for the computer and telecommunications industries. *See Kaufman* Complaint ¶ 8.

McGinn is the President, Chief Executive Officer and Chairman of the Board of Directors of Lucent. Because of his position with Lucent, McGinn is alleged to have been involved in drafting, producing, reviewing and, or, disseminating the false and misleading statements and information alleged in the *Kaufman* Complaint. *See* Moving Brief at 5. McGinn is also alleged to have approved or ratified the false and misleading statements which were issued regarding Lucent in violation of Federal securities law. *See Kaufman* Complaint ¶ 11.

Peterson is the Chief Financial Officer and Executive Vice President of Lucent.[4] *See Kaufman* Complaint ¶ 9. Because of his position with Lucent, Peterson is alleged to have been involved in drafting, producing, reviewing and, or, disseminating the false and misleading statements and information alleged in the *Kaufman* Complaint. *See* Moving Brief at 5. Peterson is also alleged to have approved or ratified the false and misleading statements which were issued regarding Lucent in violation of Federal securities law. *See Kaufman* Complaint ¶ 11.

---

1. The identity of each of the Movants is set forth in Schedule A of the Memorandum of Law in Support of Proposed Lucent Lead Plaintiffs' Motion for Appointment as Lead Plaintiffs and for Approval of Selection of Lead Counsel (the "Moving Brief"). The Movants are approximately 442 shareholders. The Movants allege they have suffered losses resulting from the purchase of Lucent Stock in the amount of $11,499,369.57.

2. In support of the Lead Plaintiffs Motion and Lead Counsel Motion, the Proposed Lead Plaintiffs submitted:
   1) The Moving Brief; and
   2) Affidavit of Steven G. Schulman in Support of Proposed Lucent Lead Plaintiffs Motion for Appointment as Lead Plaintiffs and for Approval of Selection of Lead Counsel ("Schulman Aff.") with attached exhibits.

3. The facts are derived primarily from a class action complaint, filed before the consolidation of this matter on 25 February 2000, in *Susan Kaufman v. Lucent Technologies, Inc., Richard A. McGinn and Donald K. Peterson,* Civil Action No. 00–156 (the *"Kaufman* Action," or the *"Kaufman* Complaint"). The complaint filed in the *Kaufman* Action is relied upon for purposes of these motions because Susan Kaufman, named plaintiff in the *Kaufman* Action, was the first to file. In addition, the *Kaufman* Action, as the first filed action, serves as a preliminary basis for the timing and notice provisions of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4 ("the PSLRA").

4. Defendants McGinn and Peterson are referred to collectively as the "Individual Defendants."

## B. *The Proposed Lead Plaintiffs*

The Proposed Lead Plaintiffs are offered as a group consisting of the Pension Trust Fund, Clevenger and Altman. *See* Moving Brief at 2. The individual Proposed Lead Plaintiffs have expressed a willingness to serve as lead plaintiffs in the instant action.[5] *See* Schulman Aff., Ex. C (attaching certifications from each of the Proposed Lead Plaintiffs). As required by 15 U.S.C. § 78u–4(a)(2)(A) ("Section 78u–4(a)(2)(A)"), each Proposed Lead Plaintiff executed a certification attesting to its or his willingness to serve as a representative party in the matter.[6] Each of the Proposed Lead Plaintiffs certified that it or he had reviewed the complaint and authorized its filing, had not purchased shares of Lucent Stock at the direction of counsel or in order to participate in the litigation, was willing to be a representative and if necessary, testify at deposition and trial, had not served or sought to serve as a representative party for a class in an action filed under the Federal securities laws within the last three years, and would not accept any payment for serving as a representative party. *See* Schulman Aff., Ex. C.

Each of the Proposed Lead Plaintiffs has included in the certification, a chart reflecting its or his Lucent Stock transactions during the Proposed Class Period. *See* Schulman Aff., Ex. C. For instance, in its certification, the Pension Trust Fund indicated that it made the following Lucent Stock transaction during the Proposed Class Period:

| Date | Transaction | No. Shares | Price per share |
|---|---|---|---|
| 10 November 1999 | Purchase | 11,500 | $66.6800 |

In addition to the certifications attached at Exhibit C of the Schulman Aff., information pertaining to the losses of the Proposed Lead Plaintiffs is also included in loss charts attached to Exhibit D of the Schulman Aff. *See* Schulman Aff., Ex. D (attaching loss charts containing transactions in Lucent Stock made by Movants). In the loss chart attached at Exhibit D, the Pension Trust Fund indicated that it made the following Lucent Stock transaction during the Proposed Class Period:

| Date | Transaction | No. Shares | Price per share |
|---|---|---|---|
| 10 November 1999 | Purchase | 11,500 | $66.8800 [7] |

It appears that the Pension Trust Fund still holds all 11,500 shares of Lucent Stock. The Pension Trust Fund alleges losses resulting from its transaction in Lucent Stock of $129,923.55. *See* Schulman Aff., Ex. D.

Clevenger indicated in his certification, attached at Exhibit C of the Schulman Aff., that he made the following Lucent Stock

---

**5.** The Proposed Lead Plaintiffs seek to represent a class (the "Proposed Class") consisting of all persons who purchased Lucent Stock between 27 October 1999 and 6 January 2000 (the "Proposed Class Period") and who suffered damages. *See* Moving Brief at 1, 3.

**6.** Section 78u–4(a)(2)(A) provides in pertinent part:

each plaintiff seeking to serve as a representative party on behalf of a class shall provide a sworn certification, which shall be personally signed by such plaintiff and filed with the complaint, that—
(i) states that the plaintiff has reviewed the complaint and authorized its filing;
(ii) states that the plaintiff did not purchase the security that is the subject of the complaint at the direction of the plaintiff's counsel or in order to participate in any private action arising under this title;
(iii) states that the plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary;
(iv) sets forth all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint;
(v) identifies any other action under this title, filed during the 3–year period preceding the date on which the certification is signed by the plaintiff, in which the plaintiff has sought to serve as a representative party on behalf of a class; and
(vi) states that the plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court in accordance with paragraph (4).
15 U.S.C. § 78u–4(a)(2)(A)(2000).

**7.** Ex. C of Schulman Aff. indicates that the Pension Trust Fund purchased 11,500 shares of Lucent Stock at $66.68 on 10 November 1999. Ex. D of Schulman Aff., which contains the loss charts, indicates that the Pension Trust Fund bought 11,500 shares of Lucent Stock at $66.**88** on 10 November 1999. This discrepancy will be read as a typographical error.

transaction during the Proposed Class Period:

| Date | Transaction | No. Shares | Price per share |
|------|-------------|------------|-----------------|
| 10 November 1999 | Purchase | 4,300 | $74.8750 |

In the loss chart attached at Exhibit D of the Schulman Aff., it appears the same transaction is reflected. See Ex. D of Schulman Affidavit. It appears that Clevenger still holds all 4,300 shares of Lucent Stock. Clevenger alleges losses resulting from his transaction in Lucent Stock of $81,346.11. See Schulman Aff., Ex. D.

Altman indicated in his certification, attached at Exhibit C of the Schulman Aff., that he made the following Lucent Stock purchase and sale transactions during the Proposed Class Period: [8]

| Date | Transaction | No. Shares | Price per share |
|------|-------------|------------|-----------------|
| 29 October 1999 | Sale | 200 | 64.5625 |
| 1 November 1999 | Sale | 100 | 64.2500 |
| 1 November 1999 | Sale | 200 | 64.7500 |
| 3 November 1999 | Purchase | 200 | 75.7500 |
| 3 November 1999 | Purchase | 100 | 75.7500 |
| 3 November 1999 | Purchase | 200 | 75.7500 |
| 3 November 1999 | Purchase | 100 | 75.7500 |
| 3 November 1999 | Purchase | 200 | 75.7500 |
| 3 November 1999 | Purchase | 200 | 75.7500 |
| 4 November 1999 | Sale | 100 | 67.3750 |
| 4 November 1999 | Sale | 200 | 67.5000 |
| 20 December 1999 | Sale | 200 | 80.0000 |
| 20 December 1999 | Sale | 300 | 80.0000 |
| 31 December 1999 | Purchase | 300 | 74.9375 |
| 31 December 1999 | Purchase | 1,400 | 74.9375 |

In the loss charts attached at Exhibit D, however, it appears that Altman made similar transactions during the Proposed Class Period although there appears to be a discrepancy concerning the number of transactions and the price paid for certain shares. It appears that Altman still holds 2,400 shares of the shares of Lucent Stock he purchased. Altman alleges losses resulting from his transactions in Lucent Stock of $44,933.73. See Schulman Aff., Ex. D.

### C. Procedural History

The instant action is a consolidation of several cases filed against Lucent, McGinn and Peterson.[9] Proposed Lead Plaintiffs filed the Lead Plaintiffs Motion and Lead Counsel Motion on 7 March 2000. No other party filed a motion for appointment of lead plaintiffs or selection of lead counsel.

### D. The Factual Allegations

It is alleged Defendants disseminated materially false and misleading information[10] concerning the financial condition of Lucent in order to artificially inflate the price of Lucent Stock. See Kaufman Complaint ¶ 28. It is further alleged that a plan for reorganization was implemented by Defendants to mask internal problems, including declining demand and margins and escalating costs. See Kaufman Complaint ¶ 38(ii). The alleged misrepresentations and omissions of the Defendants are asserted to have effected an "unrealistically positive assessment of Lucent and its business, prospects and operations." See Kaufman Complaint ¶ 39. This misinformation is alleged to have caused Lucent Stock to trade at artificially inflated prices during the Proposed Class Period. See id.

More specifically, the Kaufman Complaint alleges that between 27 October 1999 and 6 January 2000 Lucent disseminated materially false and misleading statements concerning,

**8.** Prior to the commencement of the Proposed Class Period, Altman had purchased 1,000 shares of Lucent Stock.

**9.** The following related cases were consolidated into this action on 25 February 2000:

Susan Kaufman, Civil Action No. 00–0156; Oren Giskan, Civil Action No. 00–0157; Rachel Stern, Civil Action No. 00–0158; Zipora Baron Weber, Civil Action No. 00–0177; James Courtright, Civil Action No. 00–0204; John M. Razzano, Civil Action No. 00–0227; Peter Powers, Civil Action No. 00–0314; Stephen Schoeman, Civil Action No. 00–0265; Elliot Mayerhoff, Civil Action No. 00–0354; James Biglan, Civil Action No. 00–0418; FMWL Enterprises, Inc., Civil Action No. 00–0448; Charles Edward Norrell, Civil Action No. 00–0529; John Clifford, Civil Action No. 00–0465; Bernice Seiden, Civil Action No. 00–0610; Robert Elan, Civil Action No. 00–0621; Thomas Pearlman, Civil Action No. 00–0857; Dominie Morelli, Civil Action No. 00–0985; Tom Chaplinski, Civil Action No. 00–0995.

**10.** The following press releases, reports and statements are alleged to have been materially false and misleading: the 27 October 1999 Associated Press Report, the 27 October 1999 SG Cowen Securities Corporation Report, the 28 October 1999 Business World Report, the 2 November 1999 Associated Press Report, the 16 November 1999 Morgan Stanley, Dean Witter Report, the 7 December 1999 Robertson Stephens Press Release, and the 6 January 2000 Lehman Brothers Analyst Upgrade. See Kaufman Complaint ¶¶ 25, 26, 29, 30, 32, 33 & 34.

among other things, the deteriorating financial condition of the company, the lack of demand for the products of the company, the inability of the company to control costs and maintain profit margins and the effect of these adverse undisclosed conditions on the company's operations, liquidity, and stock price. *Kaufman* Complaint at ¶ 2. It is also alleged that Lucent failed to disclose that the company was not able to ramp-up and deliver its new products in quantities sufficient to meet market demand, that it was not able to "contain its costs or maintain its product [profit?] margins and ... the loss of the $1 billion AT & T DWMD optical equipment contract" and the adverse impact that loss would have. *Id.* at ¶ 24.

Lucent is alleged to have shocked the market by issuing a press release on 6 January 2000, which announced results for the first fiscal quarter of 2000 would fall materially short of analysts expectations. In composite after-hours trading on 6 January 2000, the price of Lucent shares fell as much as 27.89% to close to $52.19 per share. The trading volume on Lucent Stock was more than twenty-one million shares.

*Discussion*

### A. The Private Securities Litigation Reform Act of 1995

Appropriate private civil actions filed pursuant to the Federal securities laws are important; they "provide 'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [Securities and Exchange] Commission action.'" *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 310, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985). Nevertheless, private class action suits have a history of abuse. In this regard, Congress enacted the PSLRA to remedy such abuses in the securities class action litigation. *See In re Party City Sec. Litig.,* 189 F.R.D. 91, 103 (D.N.J. 1999); *In re Milestone Scientific Sec. Litig.,* 183 F.R.D. 404, 411 (D.N.J.1998) ("*Milestone I*"); *In re Cendant Corp. Litig.,* 182 F.R.D. 144, 145 (D.N.J.1998); *In re Oxford Health Plans, Inc. Sec. Litig.,* 182 F.R.D. 42, 43 (S.D.N.Y.1998); *Chill v. Green Tree Financial Corp.,* 181 F.R.D. 398, 404–05 (D.Minn. 1998); *Gluck v. CellStar Corp.,* 976 F.Supp.

542, 543–44 (N.D.Tex.1997); *Lax v. First Merchants Acceptance Corp.,* 1997 WL 461036, at *2 (N.D.Ill.11 Aug.1997).

Prior to the enactment of the PSLRA, plaintiffs in securities fraud cases tended to profit regardless of the culpability of the defendants, most of whom chose settlement over prolonged, expensive litigation. *See Party City,* 189 F.R.D. at 103; *Milestone I,* 183 F.R.D. at 411; *Gluck,* 976 F.Supp. at 543–44. Such actions were subject to manipulation by lawyers and "professional plaintiffs," whose financial holdings in the defendant issuers were insignificant. *See* Conference Report on Securities Litigation Reform, H.R.Rep. No. 369, 104th Congress, 1st Sess. 31, *reprinted in* 1995 U.S.C.C.A.N. 679, 730–34 (the "Conference Report"). Often controlling the securities class actions, these plaintiffs and lawyers reaped huge profits, to the detriment of shareholders with more significant financial holdings. *See id.; see also Party City,* 189 F.R.D. at 103; *Milestone I,* 183 F.R.D. at 411; *Cendant,* 182 F.R.D. at 145; *D'Hondt v. Digi Int'l Inc.,* 1997 WL 405668, at * 2 (D.Minn. 3 Apr. 1997).

█ Congress, through the PSLRA, sought to ensure more effective representation of investor interest in private securities class actions by transferring control of such lawsuits from the class action attorneys to the investors. *See* Conference Report at 32–35. Simply stated, the purpose behind the PSLRA is to "empower investors so that they, not their lawyers, control private securities litigation by allowing the Court to ensure the transfer of primary control of private securities litigation from lawyers to investors." *See Party City,* 189 F.R.D. at 103; *Chill,* 181 F.R.D. at 407 (quoting Conference Report at 683, 685); *Gluck,* 976 F.Supp. at 546. Congress designed the PSLRA to "protect[ ] investors who join class actions against lawyer-driven lawsuits by giving control of the litigation to lead plaintiffs with substantial holdings of the securities of the issuer." Conference Report at 32.

The PSLRA provides a method for identifying the plaintiff, or plaintiffs, who is, or are,

the most strongly aligned with the class of shareholders, and most capable of controlling the selection, and actions, of counsel. *See* Conference Report at 371; *see also Fischler v. AmSouth Bancorp.*, 1997 WL 118429, at *1 (M.D.Fla. 6 Feb. 1997). In so providing, the PSLRA replaced the outdated practice of selecting representative plaintiffs by a "race to the courthouse," with a selection system which focuses on the adequacy of the representative. *See* Conference Report at 689; *see also Party City*, 189 F.R.D. at 103; *Milestone I*, 183 F.R.D. at 412; *Cendant*, 182 F.R.D. at 145–46; *Ravens v. Iftikar*, 174 F.R.D. 651, 654 (N.D.Cal.1997).[11]

The PSLRA added section 21D to the Exchange Act ("Section 21D"), as amended, 15 U.S.C. § 78u–4. Section 21D sets forth procedures for early notification to potential class members of the filing of the class action. Under section 21D(a)(3), a plaintiff seeking to represent a class

> [s]hall cause to be published in a widely-circulated national business-oriented publication or wire service, a notice advising members of the purported class—
>
> > (I) of the pendency of the action, *the claims asserted* therein, and the purported class period;
> >
> > (II) that, not later than 60 days after the date on which the notice is published, *any member of the purported class may move the Court to serve as lead plaintiff of the purported class.*

15 U.S.C. § 78u–4(a)(3)(A)(i)(emphasis added).

The PSLRA also altered the procedure by which the lead plaintiff for the purported class is appointed. As stated, pursuant to the PSLRA, the plaintiff who is "first to file" is no longer assured of the lead plaintiff position. Section 21D(a)(3)(B)(i) provides

> the court shall consider any motion made by a purported class member in response to the notice, including any motion by a class member who is not individually

named as a plaintiff in the complaint or complaints, and *shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of the class members . . . .*

15 U.S.C. § 78u–4(a)(3)(B)(i)(emphasis added). In rejecting the "first come, first serve" determination of the lead plaintiff in favor of the most adequate plaintiff, the PSLRA "ensure[s] that institutional plaintiffs with expertise in the securities market and real financial interests in the integrity of the market would control the litigation, not lawyers." *See Party City*, 189 F.R.D. at 104; *In re Donnkenny Inc. Sec. Litig.*, 171 F.R.D. 156, 157 (S.D.N.Y.1997)(citing Conference Report at 730–34).

The selection of the most adequate plaintiff under the PSLRA is governed by a rebuttable presumption:

> [T]he court shall adopt a presumption that the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that—
>
> > (aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);
> >
> > (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
> >
> > (cc) otherwise satisfies the requirement of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u–4(a)(3)(B)(iii)(I).

This presumption of adequacy

> *may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff—*
>
> > (aa) will not fairly and adequately protect the interest of the class; or

---

11. The PSLRA, however, did not completely eliminate the "race to the courthouse." For example, plaintiffs who are first to file suit are obligated to provide notice to other purported class members of the asserted claims and the purported class period. *See* 15 U.S.C. § 78u– 4(a)(3)(A). Counsel for such plaintiffs are in a better position to aggregate other potential plaintiffs in an attempt to assemble the largest financial interest in the litigation. Indeed, it appears this was the primary design of the notice given in this case. *See*, Section B, *infra.*

(bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

15 U.S.C. § 78u–4(a)(3)(B)(iii)(II)(emphasis added).

The PSLRA further provides that once the most adequate plaintiff is selected, the "most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u–4(a)(3)(B)(v).

### B. *Appointment of Lead Plaintiffs*

#### 1. *The Notification Requirement*

■■■ The fundamental purpose of the Section 78u–4(a)(3)(A) notice requirement is to " 'present a fair recital of the subject matter of the suit and to inform all class members of their opportunity to be heard.' " *See Wenderhold v. Cylink Corp.*, 188 F.R.D. 577, 583 (N.D.Cal.1999)(referencing *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1125 (9th Cir.1977)). In the instant case, it does not appear the notification requirement has been met. *See Wenderhold*, 188 F.R.D. at 579; Conference Report at 732.

The *Kaufman* Action was the first case. filed. Pursuant to Section 21D(a)(3)(A)(i), the plaintiff in the *Kaufman* Action published the notice of pendency of the instant action (the "Notice of Pendency") in a widely-circulated national business-oriented wire service, the *Business Wire*.[12] *See* Notice of Pendency, attached to Schulman Aff. as Ex. B. The Proposed Lead Plaintiffs filed the pending Lead Plaintiffs Motion, as required under Section 21D(a)(3)(B)(II)(aa), on 7 March 2000.

■■ Notice pursuant to PSLRA should be neither technical nor uninformative nor misleading. It must be "reasonably calculated . . . to apprise [a potential lead plaintiff] of

the pendency of the action and offer [it, him, or her] an opportunity [to move the court to serve as lead plaintiff]." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Simply stated, the purpose of the early notice provision of the PSLRA is to "enable investors to intervene in the litigation and take charge of it by, among other things, selecting the lawyers to represent the class and setting the terms of their compensation." *Ravens,* 174 F.R.D. at 653.

The Notice of Pendency in this case states:

NEW YORK—(BUSINESS WIRE)—Jan. 7, 2000—Notice is hereby given that a class action lawsuit was filed in the United States District Court for the District of New Jersey, on behalf of all persons who purchased the common stock of Lucent Technologies, Inc. ("Lucent" or the "Company") (N.Y.SE: LU) between October 27, 1999 and January 6, 2000, inclusive (the "Class Period").

If you wish to discuss this action or have any questions concerning this notice of your rights or interests with respect to these matters, please contact, at Milberg Weiss Bershad Hynes & Lerach ("Milberg Weiss"), Steven G. Shulman, Samuel H. Rudman or Michael A. Swick at One Pennsylvania Plaza, 49th Floor, New York, New York 10119–0165, by telephone 1–800–___–___ or via e-mail: **end-fraud@_____.com** or visit our website at www._____.com.

The complaint charges Lucent and certain of its senior executives with violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rile 10b–5 promulgated thereunder. In particular, the complaint alleges that defendants issued a series of materially false and misleading statements concerning the Company's ina-

---

**12.** The PSLRA does not define "widely-circulated" or "wire service." *See* 15 U.S.C. § 78u–4(a)(3)(A)(i). Congress, however, intended publication to "encompass a variety of mediums [sic], including wire, electronic, or computer services." *See* Conference Report at 733; *see also Greebel v. FTP Software, Inc.*, 939 F.Supp. 57, 62 (D.Mass.1996). Several courts have commented that the *Business Wire* appears to be a business-oriented wire service within the meaning of the

PSLRA. *See Takeda v. Turbodyne Tech., Inc.*, 67 F.Supp.2d 1129, 1134 n14. (C.D.Ca.1999); *see, e.g., Greebel*, 939 F.Supp. at 62; *First Merchants Acceptance Corp.*, 1997 WL 461036, at *4 ("[T]he court must make its own interpretation as to what the term ['widely-circulated'] means."); *Lax v. First Merchants Acceptance Corp.*, 1997 U.S.Dist. LEXIS 11866 at *2 (N.D.Ill. 6 Aug. 1997).

bility to control costs and maintain profit margins.

If you are a member of the class described above you may, not later than sixty days from January 7, 2000, move the Court to serve as lead plaintiff of the class, if you so choose. In order to serve as lead plaintiff, however, you must meet certain legal requirements.

—30 —ac/ny*

CONTACT: Milberg, Weiss Bershad Hynes & Lerach, LLP
**Shareholder Relations Dept.**
E–Mail: **endfraud@_____**.com
1–800–_ _ _–_ _ _ _

*See* Schulman Aff. at Ex. B (emphasis added). It is difficult to understand how a member of the class could determine from such notice its, his or her interest in the case and how such a class member could decide whether it would be appropriate, or necessary, to move the court to act as lead plaintiff.

Viewed in the best light this four paragraph, six sentence Notice of Pendency is a bare bones notification. It advises investors only of the facts that a class action lawsuit against Lucent has been filed and that the lawsuit is on behalf of a class of persons who purchased the common stock of the company between 27. October 1999 and 6 January 2000. *Id.,* Ex. B at first paragraph. The third, two sentence paragraph states only that the complaint alleges violations of Section 10(b) and Section 20(a) of the Exchange Act and Rule 10(b) promulgated under the Exchange Act. Moreover, it only generally refers to "a series of materially false and misleading statements" without detailing either the content or dates of such statements. *Id.* at third paragraph.

In the last paragraph, the Notice of Pendency merely advises that a member of the class can move the court to serve as lead plaintiff if certain legal requirements are met. *Id.* at fourth paragraph. It does not even summarily describe the legal requirements.

It appears the Notice of Pendency was published with such haste that the notice provides neither the caption of the case, nor the name of the plaintiffs, nor the name of the judge to whom the case was assigned,

nor the address of the court, nor even a mention of the vicinage within the District where the suit was venued. *Id.* at fourth paragraph. The Notice of Pendency failed to include, and describe, the important aspects of the case.

A studied review of the Notice of Pendency would leave an interested class member wondering about not only the details of the complaint but where it, he or she could file the mentioned motion to seek appointment as lead plaintiff. It appears this was the design of the Notice of Pendency. It does not appear the purpose of the notification was to actually inform class members but rather to accumulate class members. This conclusion is evident from the other detailed language in the notice.

The second paragraph of the Notice of Pendency solicits communication from a class member concerning the action, questions about the notice or questions about a class member's rights or interests concerning the action. Any interested class member could not help but have a series of questions upon reading such a vague, inadequate document.

The firm effecting publication of the Notice of Pendency, Milberg Weiss Bershad Hynes &. Lerach ("Milberg Weiss") went to significant effort to provide the names of three Milberg Weiss attorneys, the street address of Milberg Weiss, a toll free, 800 telephone number, e-mail address and a web site. Apparently, in an effort not to lose a marketing opportunity, the e-mail address is crafted to itself catch the eye of a potential class member: "endfraud@_____.com."

Not content with the vague content of a notification apparently designed primarily to accumulate members of the class rather than to inform, class members are also directed to the "Shareholder Relations Dept." at Milberg Weiss. The Notice of Pendency is an effort at marketing; the focus should be on drafting an early, adequate, informative notification to class members so that a class member could decide whether to move the court to serve as lead plaintiff.

The intent of the § 78u–4(a)(3)(A) notice requirement is to fairly explain the subject matter of the class action so as to inform

all members of the class of their opportunity to be heard, in this instance with regard to serving as lead plaintiff. *See e.g., In re Gypsum*, 565 F.2d at 1125. Neither meaningless language nor attorney advertisement is appropriate for such a notice.

In addition to providing information concerning the pendency of the class action, the claims of the action should be described, the class period should be set out, the misstatements or omissions alleged should be described together with release dates of such disclosure and, as well, the possibility of intra-class conflicts among potential class members who purchased the stock of the company at various intervals throughout the proposed period should be described.[13] This information should be in detail sufficient to permit an interested class member to decide whether to seek appointment as lead plaintiff. If there are several misstatements or omissions which the complaint allege affected the trading price of the security at issue, the differing effect of each such misstatement or omission should also be described in detail. *Ravens*, 174 F.R.D. at 671–75.

■ While it is clear the PSLRA provides that a challenge to the adequacy of a presumptively "most adequate plaintiff" shall be made "only upon proof of a member of a purported class," 15 · U.S.C. § 78u–4(a)(3)(iii)(II), such a limitation does not exclude a challenge by the defendants to the adequacy of the notice to the class. As explained in *Wenderhold*, "Defendants also have an interest in adequate notice." *Id.* 188 F.R.D. at 579. As Judge Walker explained: "[E]xcluding [D]efendant from the discussion of what notice is adequate would not serve to

bring to light the range of considerations the court should have in view when deciding upon notice." *Id.* at 580.

Accordingly, because the Notice of Pendency in this case is inadequate,[14] new notification will be given via publication in the Wall Street Journal, together with a direct mailing of such notification to all known members of the Proposed Class. Before such re-notification, counsel for Kaufman are directed to draft a new notice of pendency ("The Second Notice of Pendency") and submit same to the court, and counsel for Defendants for comment. This should be done no later than 12 May 2000. Counsel for Defendants may submit comment on the adequacy of the proposed Second Notice of Pendency by the close of business 22 May 2000. The Second Notice of Pendency should be republished no later than the close of business 2 June 2000.

### 2. *The Largest Financial Interest Requirement*

■ As discussed, a presumption of adequacy arises when the "group of persons" having the largest financial interest among the named plaintiffs in the class action seeks appointment as lead plaintiff. *See* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(bb). The PSLRA neither explains the term "largest financial interest" nor provides guidance as to how such a determination is made.

Although Proposed Lead Plaintiffs do not have the largest financial interest in the Proposed Class, Proposed Lead Plaintiffs do have a significant financial interest and their application is unopposed.[15] *See* Moving Brief

---

**13.** Because Judge Vaughn R. Walker carefully addressed and explained the possible conflicts in *Ravens*, 174 F.R.D. at 671–75, the issue is treated in an abbreviated fashion in this opinion.

**14.** The instant matter differs from many of the other actions which have been filed in recent years under the PSLRA (*e.g., Weikel v. Tower Semiconductor Ltd., In re Party City Secs. Litig.* and *In re Nice Sys. Secs. Litig.*). Because Lucent Stock is investment-grade, it is not unreasonable to expect the number of institutional investors in such a stock to be higher than in non-blue chip stocks. Consequentially, it would be expected that several of the institutional investors would

show an interest in acting as lead plaintiff in order to protect their investments.

The situation in this case presents cause for concern, regarding the fact that two individual investors with modest holdings and one institutional investor with moderate holdings were the only class members to apply as representative parties. This may be the result of the inadequacy of the Notice of Pendency.

**15.** From a review of the Exhibits of the Schulman Affidavit, it appears the investor with the largest financial interest in this matter is Barings Limited ("Barings Ltd."). Although not detailed, it further appears that Barings Ltd. is an institutional investor. Barings Ltd. purchased 93,500

at 2, 3. By default, Proposed Lead Plaintiffs nominally satisfy the requirement of having the largest financial interest. *See Koppel v. 4987 Corporation*, 1999 WL 608783, at *8 (S.D.N.Y.11 Aug.1999) ("As the only movant for appointment as lead plaintiff, Koppel has the largest financial interest in the relief sought. . . .").

■ During the Proposed Class Period, the Proposed Lead Plaintiffs purchased 18,-000 shares of Lucent Stock. *See* Certifications of Proposed Lead Plaintiffs, attached to Schulman Aff. as Ex. C. Collectively, the Proposed Lead Plaintiffs estimate their losses as a result of the securities violations alleged in the instant action as $256,203.40. *See* Moving Brief at 10–11.[16] Proposed Lead Plaintiffs collectively assert they "have the largest financial interest of any shareholder or group of shareholders of Lucent Stock." *See* Moving Brief at 15. The matter does not end there, however. Pursuant to the PSLRA, a District Court has a duty to determine whether a lead plaintiff or a group of such plaintiffs can actually oversee the conduct of the litigation and, as well, monitor the effectiveness and efficiency of counsel.

### 3. *Rule 23 Requirements*

■ The PSLRA requires that the Proposed Lead Plaintiffs demonstrate they "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure [ ("Rule 23") ]." *See* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(cc); *see also Party City*, 189 F.R.D. at 106; *Chill*, 181 F.R.D. at 408 ("Ultimately, the PSLRA channels the concern, as to the adequacy of representation, through Rule 23."). Rule 23(a) provides:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defense of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

"A wide-ranging analysis under Rule 23 is not appropriate [at this stage of the litigation] and should be left for consideration of a motion for class certification." *Fischler*, 1997 WL 118429, at *2; *see also Aronson v. McKesson HBOC, Inc.*, 79 F.Supp.2d 1146, 1158 (N.D.Cal.1999) ("At the lead plaintiff selection stage, all that is required is a 'preliminary showing' that the lead plaintiff's claims are typical and adequate."); *Wenderhold*, 188 F.R.D. at 587; *Gluck*, 976 F.Supp. at 546 ("Evidence regarding the requirements of Rule 23 will of course, be heard in full at the class certification hearing. There is no need to require anything more than a preliminary showing at this stage.").

A preliminary, fact-specific inquiry is, nevertheless, necessary under Rule 23 to determine whether the presumptively most adequate plaintiff will adequately represent the interests of the class. *See Party City*, 189 F.R.D. at 106; *Milestone I*, 183 F.R.D. at 414; *Chill*, 181 F.R.D. at 408; *see also In re Ford Motor Co. Bronco II Product Liability Litig.*, 177 F.R.D. 360, 367 (E.D.La.1997). This inquiry "focus[es] on the qualities of the class representatives enumerated in Rule

shares of Lucent Stock during the Proposed Class Period. It further appears Barings Ltd. still holds 93,500 shares of the shares of Lucent Stock purchased during the Proposed Class Period and the losses of Barings Ltd. are estimated at $1,694,828.46. Barings Ltd., however, has not requested appointment as lead plaintiff.

The investor with the second largest financial interest in this matter appears to be the "JB Global Megatrend Stock Fund." The JB Global Megatrend Stock Fund purchased 50,000 shares of Lucent Stock during the Proposed Class Period. It further appears the JB Global Megatrend Stock Fund still holds the shares of Lucent Stock it purchased during the Proposed Class Period

and its losses are estimated at $1,034,081.00. The JB Global Megatrend Stock Fund has not requested appointment as lead plaintiff.

16. The estimated damage values are mentioned in this opinion simply to demonstrate the potential financial interest of the Proposed Lead Plaintiffs in the instant action. The inclusion of these values does not preclude a later challenge to the appropriateness of valuation or the method of calculation. Indeed, it does not appear these estimates of damages considered whether other independent, intervening forces affected the market value of Lucent Stock during the Proposed Class Period.

23(a)(3) and 23(a)(4), that is typicality and adequacy." *Gluck*, 976 F.Supp. at 546.[17]

■ The Proposed Lead Plaintiffs have demonstrated, at this preliminary stage, typicality. The typicality requirement under Rule 23(a)(3)

> permits the court to assess whether the class representatives themselves present those common issues of law and fact that justify class treatment, thereby tending to assure that the absent class members will be adequately represented.

*Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir.1985); *see also General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 159, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *In re Prudential Ins. Co. of America Sales Practices Litig.*, 148 F.3d 283, 311 (3d Cir.1998); *Baby Neal v. Casey*, 43 F.3d 48, 57 (3d Cir.1994); *In re Nice Systems Sec. Litig.*, 188 F.R.D. 206, 218 (D.N.J.1999).

■ The typicality requirement helps ensure alignment of the interests of the Proposed Class with those of the class representatives "so that the [class representatives] will work to benefit the entire class through the pursuit of their own goals."[18] *In re Prudential*, 148 F.3d at 311; *see also Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 631 (3d Cir.1996), *aff'd, Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Baby Neal*, 43 F.3d at 57.

■ Rule 23(a)(3) does not require the claims of the Proposed Lead Plaintiffs be identical to those of the class. *See In re Prudential*, 148 F.3d at 311; *Eisenberg*, 766 F.2d at 786; *Weiss v. York Hospital*, 745 F.2d 786, 809 (3d Cir.1984). Rather, the typicality requirement is satisfied when the "plaintiff's claim arises from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory." *See Baby Neal*, 43 F.3d at 58; *Eisenberg*, 766 F.2d at 786. The typicality requirement is not met, however, where the " 'plaintiff's factual or legal stance is not characteristic of that of other class members.' " *Gunter v. Ridgewood Energy Corp.*, 164 F.R.D. 391, 395 (D.N.J.1996) (quoting *Weiss*, 745 F.2d at 808).

■ The Proposed Lead Plaintiffs argue the typicality requirement has been met because the Proposed Lead Plaintiffs and the other members of the Proposed Class purchased Lucent Stock on the open market during the Proposed Class Period at prices allegedly artificially inflated by the false and misleading statements issued by Defendants and suffered damages thereby. *See* Moving Brief at 13; *see also In re Prudential*, 148 F.3d at 311; *Baby Neal*, 43 F.3d at 56; *Hoxworth v. Blinder, Robinson & Co., Inc.*, 980 F.2d 912, 923 (3d Cir.1992) (quoting *Grasty v. Amalgamated Clothing & Textile Workers Union*, 828 F.2d 123 (3d Cir.), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 773, 98

---

17. Generally, a defendant or defendants may not object to the adequacy or typicality of the proposed lead plaintiff at this preliminary stage of the litigation. *See Gluck*, 976 F.Supp. at 550 ("Defendants have no standing to oppose the appointment of Lead Plaintiff at this stage of the litigation."); *see also Zuckerman*, 1997 WL 314422, at *2; *Greebel*, 939 F.Supp. at 60–61. "The statute is clear that only potential plaintiffs may be heard regarding appointment of a Lead Plaintiff." *Gluck*, 976 F.Supp. at 550. The PSLRA specifically provides "the court shall consider *any motion made by a purported class member*" in determining the adequacy of a proposed lead plaintiff. *See* 15 U.S.C. § 78u–4(a)(3)(B)(i)(emphasis added); *see also* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II)("The presumption described in [15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)] may be rebutted only upon proof by a member of the purported plaintiff class. . . .").

The determination, however, that some or all of the Proposed Lead Plaintiffs meet the require-

ments of Rule 23 does not preclude revisiting the issue at the class certification stage. The opportunity for Lucent and, or, the Individual Defendants to contest, if appropriate, class certification on these grounds is preserved.

18. As discussed below, the typicality requirement of Rule 23 is satisfied if the claims of the proposed class representative arise from the same event or course of conduct that gave rise to the claims of the other class members and are premised upon the same legal theory. The presence of a common core of operative facts and the assertion of similar legal theories does not, however, guarantee the alignment of interests among the Proposed Class and the Proposed Lead Plaintiffs. Other factors independent of the facts forming the basis of the cause of action, may work to create conflicting interests among the various members of the Proposed Class and those seeking appointment as lead plaintiffs.

L.Ed.2d 860 (1988)) (" 'factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members.' ").

The *Kaufman* Complaint contains allegations and a recitation of facts which are similar, if not identical, to the other class action complaints filed against the Defendants before the consolidation of this matter. The legal claims and legal theories of the Proposed Lead Plaintiffs are not so "markedly different" from those of other class members, so as to render them atypical. *See Eisenberg*, 766 F.2d at 786 (citing *Weiss*, 745 F.2d at 809 n. 36).

The adequacy of the representation requirement presents an inquiry that reaches beyond the factual allegations and legal theories of a complaint. The possibility of an individual plaintiff having interests in conflict with the absent class members must be considered. As explained, a finding that the claims of the Proposed Lead Plaintiffs are typical of those of the Proposed Class does not, standing alone, ensure that the interests of the Proposed Lead Plaintiffs are sufficiently aligned with the Proposed Class. Forces independent of the common core of facts from which this matter arose may work to create an internal conflict among the class.

▄▄▄ Adequacy, for purposes of the lead plaintiff determination, is contingent upon both the existence of common interests among the proposed lead plaintiffs and the class, and a willingness on the part of the proposed lead plaintiff to vigorously prosecute the action. *See Milestone I.*, 183 F.R.D. at 416. The adequacy of representation inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products*, 521 U.S. at 625, 117 S.Ct. 2231.

▄▄▄ In order to assist the court in determining whether several proposed lead plaintiffs are in fact capable of performing as a group, such proposed group should provide the court with information pertaining to its members, its structure and how it will function. More precisely, the information should encompass, at minimum, a description of the members, an explanation of how the group was formed, whether there was a pre-existing relationship among any of the members and how the group intends to handle communications among its members and with lead counsel.

In the instant matter, no such information has been offered by the Proposed Lead Plaintiffs, either individually or collectively. It is not clear whether the Pension Trust Fund, Clevenger and Altman even know that they have been offered as a group.[19] The only inference that can be drawn from the submissions is that each of the Proposed Lead Plaintiffs has a connection to the Proposed Lead Counsel. Presently, the only common point among the Proposed Lead Plaintiffs appears to be Proposed Lead Counsel, and that is not sufficient. This situation raises the question: who has the greater interest in this lawsuit—Proposed Lead Plaintiffs or Proposed Lead Counsel?

Congress. "expect[ed] that the [lead] plaintiff will choose counsel rather than, as is true today, counsel choosing the plaintiff." Conference Report at 6. Congress intended the creation of the lead plaintiff provision to encourage institutional investors to seek out a more active role in securities action lawsuits. Congress determined that increasing the role of institutional investors in such actions would improve the quality of representation, thus benefitting shareholders and assisting courts. *See* Conference Report at 733. On balance, institutional investors are better able and more willing, than either so-called figurehead plaintiffs or courts, to monitor attorney conduct in securities class actions. *See In re Baan*, 186 F.R.D. at 223 (citing *In re California Micro Devices Sec. Litig.*, 168 F.R.D. 257, 275 (N.D.Cal.1996)).

In general, institutional investors "have financial interests in the outcome of securities class actions which dwarf the interests of

---

**19.** Because each of the Proposed Lead Plaintiffs executed a certification indicating that it or he is willing to act as a representative, it is assumed that each wants to be a lead plaintiff. What these certifications do not indicate, however, is whether each member of this group is aware that it or he has been offered with two other representatives as part of a group.

individual plaintiffs." *In re Baan*, 186 F.R.D. at 223 (citing *California Micro Devices*, 168 F.R.D. at 275). As the degree of financial interest intensifies, so does the incentive to monitor the conduct of the class counsel. Furthermore, because of their greater resources and higher levels of awareness gained from prior involvement in similar actions, institutional investors are simply better able to conduct such monitoring. *See id.*

Altman appears to retain 2,400 shares of the shares of Lucent Stock he purchased. *See* Schulman Aff., Ex. D. Unlike the other Proposed Class Members, however, Altman engaged in several transactions during the Proposed Class Period. *See Id.* Clevenger appears to retain 4,300 shares of the Lucent Stock he purchased. *See* Schulman Aff., Ex. D. While this is not an insubstantial number of shares, several of the Proposed Class Members hold more than 4,300 shares. *See id.* Furthermore, neither Altman nor Clevenger appears to offer anything which the Pension Trust Fund does not provide. For example, there is no evidence of superior ability to handle Proposed Lead Counsel or otherwise manage the litigation.

The court is under no obligation to accept Altman or Clevenger as a proposed lead plaintiff merely because their proposed appointment is unopposed by other members of the Proposed Class. *See In re Network Assoc., Inc.*, 76 F.Supp.2d 1017, 1024 (N.D.Cal.1999) (citing *In re Baan*, 186 F.R.D. at 218–35) ("a district court need not accept as lead plaintiff any proffered group of investors.").

Finally, the Proposed Lead Plaintiffs have failed to demonstrate how they would cooperate efficiently or how the leadership issue would be handled so that control of counsel would be maximized despite the existence of several lead plaintiffs.

Courts must evaluate both the ability and the incentive of a proposed group to work together to actively oversee the litigation. In doing so, the court must weigh the marginal benefit of including each proffered member as a lead plaintiff against the dilution of the decision-making authority of a single lead plaintiff. Following such considerations, if not satisfied with the group, a court should not hesitate to pare or eliminate such a proposed group.

The Pension Trust Fund purchased during the Proposed Class Period, and apparently retains, 11,500 shares of Lucent Stock. *See* Schulman Aff., Ex. D. Appointing the Pension Trust Fund as the sole lead plaintiff is consistent with the PSLRA. *See* Conference Report on Securities Litigation Reform, S.Rep. No. 98, 104th Congress, 1st Sess. ("The Committee believes that increasing the role of institutional investors in class actions will ultimately benefit the class and assist the courts .... The Committee believes that an institutional investor acting as lead plaintiff can, consistent with its fiduciary obligations, balance the interests of the class with the long-term interests of the company and its public investors.").

Accordingly, based upon the submissions, it appears the member of the Proposed Class "most capable of adequately representing the interests of the class members," is the Pension Trust Fund which will be provisionally approved as lead plaintiff.[20] 15 U.S.C.

---

**20.** The Pension Trust Fund is provisionally selected as lead plaintiff because it is an institutional investor and its financial interest in the instant litigation is greater than the financial interests of Clevenger and Altman, individually or combined. As well, it has not been demonstrated either or both Clevenger and Altman that add anything to assist the Pension Trust Fund. On the contrary, it appears as explained, there is no connection among the three proposed representatives. As such, coordination and consistency may be elusive.

Another possible issue bears mention at this point. The Pension Trust Fund may be regarded as a "Retention Plaintiff." Retention Plaintiffs are investors who retain an equity interest in the corporation against which they bring suit, in this instance Lucent. In addition to the Retention Plaintiff, this group of Proposed Lead Plaintiffs also appears to include an "In/Out Plaintiff." An In/Out Plaintiff is an investor who has sold some or most of his or her interest in the corporation against which suit is brought.

This situation brings about the possibility of an inherent and fundamental conflict between the Retention Plaintiffs and the In/Out Plaintiff (the "Retention/Seller Conflict") in the group of Proposed Lead Plaintiffs, as well as in the Proposed Class. The Retention/Seller Conflict has been described as follows:

§ 78u–4(a)(3)(B). *See Greenberg v. Bear Stearns & Co.*, 80 F.Supp.2d 65, 70 (E.D.N.Y. 2000) ("one of the stated purposes of the PSLRA ... is to 'minimize costs' and ... 'give control of the litigation to lead plaintiffs with substantial holdings to the securities of the issuer.' " (citing Conf. Rep. on Sec. Litig. Reform, H.R.Rep. No. 104–369, 104th Congress, 1st Sess.)). Further, it appears the interests of the Pension Trust Fund are sufficiently-aligned with the other members of the Proposed Class to allow it to adequately and vigorously prosecute the instant action.

Neither Altman nor Clevenger is approved as a lead plaintiff in the instant action.[21] As discussed above, neither Clevenger nor Altman has established any unique skills or experience in handling a matter such as this. *See Wenderhold,* 188 F.R.D. at 586 (lead plaintiff application on behalf of additional individual investors was denied because individuals did "not purport to possess any unique expertise that would enable them to monitor class counsel more effectively.") Further, the financial interest of either Clevenger or Altman is substantially less than the interest of the Pension Trust Fund. *See id.* (application also denied because the "additional plaintiffs do not contribute a significant level of financial interest."). Additionally, the Pension Trust Fund is a Retention plaintiff and Altman is not.[22] *See* n. 15,

*supra.* This could lead to conflicting litigation strategies, which is not consistent with the goals of the PSLRA.

As mentioned, the court is under no obligation to accept any proffered investor. *See Network Assoc.,* 76 F.Supp.2d at 1024; *Wenderhold,* 188 F.R.D. at 584 ("Although the PSLRA expressly permits the appointment of more than one lead plaintiff, courts have discretion to reject motions for the appointment of group lead plaintiffs if such an appointment would contravene the aims of the PSLRA."); *Mitchell v. Complete Management, Inc.,* No. 99–2846, 1999 WL 728678, at *3 (S.D.N.Y.17 Sept.1999)(the "PSLRA does not 'recommend or delimit a specific number of lead plaintiffs, and ... the lead plaintiff decision must be made on a case-by case basis, taking account of the unique circumstances of each case.' ").

### 4. *Presumption Not Rebutted*

Other than as explained, the presumption of adequacy has not been rebutted as to the Pension Trust Fund. As observed, the presumption may be overcome by showing the Proposed Lead Plaintiff will not "fairly and adequately protect the interest of the [C]lass," or is "subject to unique defenses that render [the Proposed Lead Plaintiff] incapable of adequately representing the

The In/Out Plaintiff's interest lies in minimizing the degree of price inflation existing at the date of the sale. A retention plaintiff buying on that date ... has an exactly opposite interest; i.e., such a person would seek to maximize the degree of price inflation existing on that date. *In re Seagate Tech. II Sec. Litig.,* 843 F.Supp. 1341, 1359 (N.D.Cal.1994); *see also Ballan v. Upjohn Co.,* 159 F.R.D. 473, 484 (W.D.Mich. 1994) ("Equity plaintiffs who continue to own an interest in the defendant company will wish to moderate the case because while it is in their interest to recover damages, they will also desire to limit the total liability of the corporation to protect their holdings. In contrast, non-equity plaintiffs are indifferent to the negative effect that a large damage award might have on a defendant corporation. Consequently, they will seek to enhance the evidence of corporate wrongdoing without reservation. Thus ... there will be an underlying conflict between those who have subsequently sold their stock, and those who have retained it."). The *Seagate II* court declined to certify a plaintiff class until after the resolution of the damages

issues. *See id.* at 1367. Most courts, however, have rejected the analysis of the Retention/Seller Conflict set forth in *Seagate II*. *See Picard Chemical v. Perrigo Co.,* 1996 WL 739170, at *6 (W.D.Mich.27 Sept.1996) ("[T]his court believes that the potential for intraclass conflict is a peripheral concern to a class whose primary interest is in proving the materiality of the alleged omissions in an effort to prove liability."); *see also Weikel v. Tower Semiconductor Ltd.,* 183 F.R.D. 377, 395 (D.N.J.1998) (declined to follow *Seagate II* based in part because "[a]ny concerns that may arise can be adequately addressed by the creation of subclasses.").

**21.** Ex. D of the Schulman Aff. evidences that Altman engaged in several sales and purchases during the Proposed Class Period. It appears from the loss charts Altman may not have the requisite experience or motivation to adequately represent the Proposed Class Members.

**22.** Although Clevenger, like the Pension Trust Fund, is a Retention Plaintiff, this fact alone does not necessitate his appointment as a lead plaintiff.

[Proposed] Class." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II). As mentioned, the adequacy of the Pension Trust Fund has not been challenged by any member of the Proposed Class. Indeed, there has been an absence of interest in the position of lead plaintiff.[23] Absent such a challenge, the presumption of adequacy will generally survive. *See Party City,* 189 F.R.D. at 112.

### 5. *Propriety of Multiple Lead Plaintiffs*

■ The fact that a group, as opposed to a single plaintiff, is proposed as lead plaintiff does not necessarily render such a group inadequate. The PSLRA expressly provides a "group of plaintiffs" may be deemed most adequate plaintiffs. *See* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I). The appointment of more than one lead plaintiff does not violate the PSLRA. *See Oxford,* 182 F.R.D. at 48–49; *In re Cephalon,* 1996 WL 515203, at *1 (E.D.Pa.27 Aug.1996).

■ While the PSLRA does not limit the number of proposed lead plaintiffs, a "rule of reason prevails." *See Chill,* 181 F.R.D. at 409. As mentioned, as the number of proposed lead plaintiffs increases, the degree of dilution of their control over the class action may well increase. The inevitable dilution of control stemming from the appointment of several lead plaintiffs may result in weakened bargaining power of the lead plaintiffs, as well as a loss of control over counsel.

Several lead plaintiffs may be hampered in their collective ability to effectively negotiate retention agreements and supervise the conduct of counsel. *See Cendant,* 182 F.R.D. at 148 ("[R]epresentation by a disparate group of plaintiffs, each seeking only the protection of its own interests, could well hamper the force and focus of the litigation."). In this regard, the appointment of multiple lead plaintiffs may

> detract from the [PSLRA's] fundamental goal of client control, as it would inevitably delegate more control and responsibility to the lawyers for the class and make the class representative more reliant on the lawyers.

*Gluck,* 976 F.Supp. at 549–50; *see also Steiner v. Frankino,* No. 1:98 CV 0264, slip op. at 12 (N.D. Ohio 16 July 1998); *Donnkenny,* 171 F.R.D. at 157–58.

One court, in appointing co-lead plaintiffs, reasoned that multiple lead plaintiffs allow for "diverse representation." *See Oxford,* 182 F.R.D. at 49. Diverse representation is, however, an insufficient rationale by which to justify the appointment of multiple lead plaintiffs. Focusing on considerations such as diverse representation and additional capital, however, overlooks the fundamental goal of the PSLRA—the empowerment of a unified force to control the litigation. *See* Conference Report at 683, 685.

Where several lead plaintiffs have divergent interests, the leadership of a class may be divided, and rendered factious. While the PSLRA refers to "a person or group of persons" as being capable of serving as the lead plaintiff, the surrounding statutory language forecloses the appointment of several groups or several individuals not part of a cohesive group. Significantly, apart from the sole reference to a "group of persons," the PSLRA is worded in the singular, providing a mechanism for the appointment of "the most adequate *plaintiff,*" not the most adequate plaintiffs. *See* 15 U.S.C. § 78u–4(a)(3)(B)(i) and (iii).

When considering a motion concerning the appointment of a lead plaintiff or plaintiffs, the policies behind the PSLRA must be recognized. The composition of the proposed lead plaintiffs should be scrutinized carefully. *See, e.g., In re Nice Systems,* 188 F.R.D. at 220.

When the "interests of proposed lead plaintiffs are aligned, concerns regarding the division of authority and dilution of control are not paramount." *Milestone I,* 183 F.R.D. at 418; *see also Party City,* 189 F.R.D. at 114. The provisional appointment of the Pension Trust Fund as lead plaintiff, and the exclusion of Clevenger and Altman, should provide the desired alignment of interests. Further, it appears the Pension Trust Fund will be able to serve the statuto-

---

**23.** The publication of the Second Notice of Pendency may result in a challenge to the provision-

al appointment of the Pension Trust Fund as Lead Plaintiff.

ry purpose of the PSLRA. *See Party City,* 189 F.R.D. at 114. Nevertheless, this appointment will not be final until the Second Notice of Pendency is published and the members of the Proposed Class have the opportunity to make an informal decision whether to seek appointment as lead plaintiff.

The Pension Trust Fund should be able to effectively control counsel. The provisional appointment of the Pension Trust Fund appears to meet one of the most important goals of the PSLRA—the appointment of an institutional investor to serve as lead plaintiff in securities class actions. Accordingly, the Lead Plaintiffs Motion is provisionally granted to the extent it sought the appointment of the Pension Trust Fund. It is recognized, however, that the primary fiduciary obligation of the Pension Trust Fund is to its beneficiaries and this obligation may impact on its ability to function as a fiduciary to the members of the Proposed Class. *In re Oxford,* 182 F.R.D. at 46–47. If because of this or other considerations the Pension Trust Fund is either not capable of discharging the fiduciary duties of Lead Plaintiff, including controlling and directing Lead Counsel, or is not inclined to do so, the Pension Trust Fund may resign from the position of Lead Plaintiff. The Lead Plaintiffs Motion is denied to the extent it sought the appointment of Clevenger and/or Altman.

## C. *Appointment of Lead Counsel*

██ The approval of lead counsel pursuant to Section 21D(a)(3)(B)(v) is not governed by the same statutory guidelines which control the lead plaintiff determination. *See Party City,* 189 F.R.D. at 114; *Nice Systems,* 188 F.R.D. at 221; *In re Milestone Scientific Sec. Litig.,* 187 F.R.D. 165, 175 (D.N.J.1999) (*"Milestone II"*); *Cendant,* 182 F.R.D. at 149. The decision to approve counsel selected by the lead plaintiff is a matter within the discretion of the District Court. Proposed lead counsel is simply that—proposed.

The legislative history of the PSLRA reveals that Congress wished to encourage the exercise of discretion in approving the selection of lead counsel.

[Congress] does not intend to disturb the court's discretion under existing law to approve or disapprove the lead plaintiff's choice of counsel when necessary to protect the interests of the plaintiff class.

Conference Report at 685. The nature and extent of such inquiry may vary from case to case. *See Nice Systems,* 188 F.R.D. at 222; *Milestone II,* 187 F.R.D. at 176.

The judgment of a lead plaintiff is not dispositive in the appointment of lead counsel. Approval of lead counsel necessarily requires an independent evaluation of, among other considerations, the effectiveness of proposed class counsel to ensure the protection of the class. *See Milestone II,* 187 F.R.D. at 176. A lead plaintiff has significant responsibilities and duties, which include managing and directing the case. *See id.* Disputes concerning the direction of the case must be addressed and resolved by the lead plaintiff.

██ The selection of counsel by lead plaintiff must be the product of deliberate and in depth evaluation, as well as of independent, arm's length negotiations. As this Circuit has observed: "[T]he lead attorney position is coveted as it is likely to bring its occupant the largest share of the fees generated by the litigation." *Garr v. U.S. Healthcare, Inc.,* 22 F.3d 1274, 1277 (3d Cir.1994); *see also Party City,* 189 F.R.D. at 115; *Nice Systems,* 188 F.R.D. at 223; *Milestone II,* 187 F.R.D. at 177. As a consequence, there arises the possibility that a law firm may exert, or attempt to exert, significant pressure on a lead plaintiff.

In *Milestone II,* it was observed "unless there has been active, effective client participation in the [selection] process, it is possible that the counsel arrangement may simply reflect bargaining among lawyers for their own stake in the case, and not serve the best interests of the class." *Id.,* 187 F.R.D. at 178.

In the instant case, Proposed Lead Plaintiffs seek approval of their selection of Milberg Weiss to serve as lead counsel. *See* Moving Brief at 15. In drafting both the lead counsel and the lead plaintiff provisions of the PSLRA, "Congress sought to eliminate the practice that had occurred at times

where counsel effectively chose itself as lead counsel by selecting a plaintiff and initiating litigation." *In re Baan*, 186 F.R.D. at 229.

Based solely on a review of the Moving Brief and the accompanying submissions, it is not possible to determine whether the Proposed Lead Plaintiffs actively sought out and made an informed decision regarding the choice of lead counsel. In support of their selection of Proposed Lead Counsel, the Proposed Lead Plaintiffs state only that they have "retained competent and experienced counsel to prosecute these claims .... [P]roposed Lead Counsel is highly qualified, experienced and able to conduct this complex litigation in a professional manner." *See* Moving Brief at 14–15. The Proposed Lead Plaintiffs further state that "Milberg Weiss has extensive experience in successfully prosecuting shareholder and securities class actions, and has frequently appeared in major actions in this and other Courts." *See* Moving Brief at 15. Significantly, these comments are included in the Moving Brief itself, not in the certifications of the proposed representatives. This language is solely attributable to Proposed Lead Counsel, not the Proposed Lead Plaintiffs.

While proposed Lead Plaintiffs have provided the court with data attesting to the skill and experience of Proposed Lead Counsel, the skill and experience of counsel are only part of the equation which must be considered when granting a motion for lead counsel. As discussed, there must also be independent, arm's-length negotiating between a lead plaintiff and the chosen lead counsel. Subsumed within this requirement is the need for independent decision-making on the part of a lead plaintiff in choosing lead counsel.

It is interesting that in a matter consolidated from eighteen separate complaints and involving thousands of plaintiffs, not a single party has opposed either the Motion for Lead Plaintiff or the Motion for Lead Counsel or proposed other counsel. This apparent apathy suggests possible collusion or a "too comfortable" arrangement among counsel who appear to be directing this litigation. Or as likely, from the failure of the Notice of Pendency to adequately inform the proposed class of the right to move the court to serve as lead plaintiff. It seems unlikely that there has been a great deal of (if any) independent, arm's-length negotiating between Lead Plaintiff and the proposed lead counsel.

■ "The lead plaintiff owes a fiduciary duty to obtain the highest quality representation at the lowest price." *In re Network Assoc.*, 76 F.Supp.2d at 1033. In the instant matter, Proposed Lead Plaintiffs have provided no evidence or indication of the proposed fee arrangement, its terms, or discussions or proposals leading up to it. They have provided no indication as to how the selection of Proposed Lead Counsel was arrived at nor what considerations went into the decision. Significantly, there is no indication of whether other counsel were interviewed or even considered. This is troubling.[24]

### Bidding for Lead Counsel Position

■ As mentioned, the Pension Trust Fund has been provisionally appointed as lead plaintiff, pending receipt of motions from other interested members of the class to serve as lead counsel. In an effort to keep this matter moving and in recognition of the possibility that the Pension Trust Fund may decline to continue as lead plaintiff or may be replaced following receipt of a motion from other members of the class, a determination of lead counsel will be made through a competitive bid process. It is clear this procedure is necessary to protect the interests of the proposed class. *See In re Cendant Corp. Litigation*, 182 F.R.D. 144, 150–52 (D.N.J. 1998); *Wenderhold*, 188 F.R.D. at 587. It is also clear that attorney compensation of a

24. A name partner of Milberg Weiss, William Lerach, has been quoted as saying, " 'I have the greatest practice in the world because I have no clients. I bring the case, I hire the plaintiff. I do not have some client telling me what to do. I decide what to do.' " *Network Assoc.*, 76 F.Supp.2d at 1032. In addition, the Proposed Lead Counsel has been singled out for criticism. *Network Assoc.*, 76 F.Supp.2d at 1032. Despite these observations, it appears, at the present time, Milberg Weiss has as much right as other counsel to seek the role of Lead Counsel in this case. *Id.*

percentage of the recovery fee, including costs, will provide the best avenue to coordinate the interests of the Proposed Class and future counsel.

A sealed-bid auction will occur. Any law firm, including those presently unconnected with this litigation, seeking to be designated class counsel for the Proposed Class in this action shall submit a proposal for such representation to the Office of the Clerk, United States District Court, District of New Jersey on or before 4:00 o'clock p.m., 2 June 2000. The bid shall be filed *ex parte* under seal. The joint proposals are not to be submitted and will not be considered. Nevertheless, counsel selected to represent the class will be permitted to assign tasks to other lawyers. Each proposal to be submitted must identify each defendant from which or whom discovery is sought and further state:

1. The experience of the firm in securities class action litigation together with the background and experience of those particular lawyers in the firm who will be assigned to represent the class;

2. The qualifications of the firm to perform all work required for representation, including whether the firm will post a completion bond, or other type of security, for the rendering of services to the proposed class, together with a description of the terms of such bond or security;

3. A description of the malpractice insurance coverage for the firm and each of the lawyers to be assigned to representation;

4. A demonstration that the firm has thoroughly evaluated the case and a specification of the range, and probability of, recovery;

5. A statement of the dollar amount, as well as percentage, of any recovery the firm will charge in the event of a recovery as fees and costs for all work performed, such a statement is to be provided for each of the following four contingencies:

   a. for pleading through motions to dismiss;

   b. following the completion of the motion to dismiss through adjudication of motions for summary judgement;

   c. following completions of the motions for summary judgement through verdict at trial;

   d. following verdict at trial through appellate determination.

Such bid should indicate *for each of the four contingencies* on both a dollar amount and percentage basis of the net recovery to the class after fees and costs in at least the following recovery situations:

| Dollar Amount of Total Class Recovery | Dollar Amount of Total Class Recovery Net of Attorney Fees and Expenses | Percentage of Total Class Recovery Net of Attorney Fees and Expenses | Dollar Amount of Attorney Fees and Expenses for Total Class Recovery | Percentage of Attorney Fees and Expenses from Total Class Recovery |
|---|---|---|---|---|
| the first $500,000 | $ | % | $ | % |
| $500,001– $1,000,000 | $ | % | $ | % |
| $1,000,001– $5,000,000 | $ | % | $ | % |
| $5,000,001– $10,000,000 | $ | % | $ | % |
| $10,000,001– $15,000,000 | $ | % | $ | % |

| | | | | |
|---|---|---|---|---|
| $15,000,001–$20,000,000 | $ | % | $ | % |
| 20,000,001 $25,000,000 | $ | % | $ | % |
| Over $25,000,000 | $ | % | $ | % |

*See e.g., Wenderhold v. Cylink Corp.,* 191 F.R.D. 600, 603–05 (N.D.Cal.2000)

*Conclusion*

For the foregoing reasons, the Lead Plaintiffs Motion is granted in part and denied in part; the Lead Counsel Motion is denied. An order accompanies this opinion.