## In re LUCENT TECHNOLOGIES, INC. SECURITIES LITIGATION.

### No. CIV.A. 00–621(AJL).

United States District Court,
D. New Jersey.

Sept. 27, 2001.

---

David J. Bershad, Jerome M. Congress, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, New York City, Max W. Berger, Steven B. Singer, Bernstein, Litowitz, Berger & Grossman, LLP, New York City, Steven J. Toll, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, Gary S. Graifman, Robert Wilkins, Kantrowitz, Goldhamer & Graifman, Montvale, NJ, Thomas G. Shapiro, Theodore M. Hess–Mahan, Shapiro, Haber & Urmy, LLP, Boston, MA, William J. Pinilis, Kaplan, Kilsheimer & Fox, LLP, Morristown, NJ, Robert A. Hoffman, Samuel R. Simon, Barrack, Rods & Bacine, Haddonfield, NJ, Daniel E. Bacine, Barrack, Rodos & Bacine, Philadelphia, PA, Sandy Liebhard, Bernstein, Liebhard & Lifshitz, LLP, New York City, Robert Berg, Mel E. Lifshitz, Bernstein, Liebhard & Lifshitz, LLP, Fort Lee, NJ, Brian Felgoise, Offices of Brian Felgoise, Philadelphia, PA, Peter Fishbein, Law Offices of Peter Fishbein, Hasbrouck Heights, NJ, Harvey Greenfield, Law Offices of Harvey Greenfield, New York City, Allyn Z. Lite, Joseph J. DePalma, Lite, DePalma, Greenberg & Rivas, LLC, Newark, NJ, Charles J. Piven, Law Offices of Charles J. Piven, Baltimore, MD, Joseph E. Saul, Gellerstein & Saul, Teaneck, NJ, Stuart Wechsler, Samuel K. Rosen, Wechsler, Harwood, Halebian & Feffer, New York City, Fred T. Isquith, Michael Jaffe, Wolf, Haldenstein, Adler, Freeman & Herz, New York City. Andrew M. Schatz, Jeffrey S. Nobel, Schatz & Nobel, P.C., Hartford, CT, Paul Geller, Jonathan M. Stein, Shepard & Geller, Boca Raton, FL, James V. Bashian, Law Offices of James V. Bashian, New York City, Mark Topaz, Julie Kamens, Schiffrin & Barroway, Ltd., Bala Cynwyd, PA, David B. Kahn, David B. Kahn & Associates, Northfield, IL, Curtis V. Trinko, Offices of Curtis V. Trinko, LLP, New York City, Brian Barry, Law Offices of Brian Barry, Los Angeles, CA, Jules Brody, Stull, Stull & Brody, New York City, Peter D. Bull, Joshua M. Lifshitz, Bull & Lifshitz, LLP, New York City, Joseph H. Weiss, Weiss & Yourman, New York City, Dennis J. Johnson, Law Offices of Dennis J. Johnson, South Burlington, VT, Jeffrey H. Squire, Kirby, McInerney & Squire, LLP, New York City, Deborah Gross, Offices of Bernard M. Gross, P.C., Philadelphia, PA, Klari Neuwelt, Law Offices of Klari Neuwelt, New York City, Paul Geller, Cauley & Geller, LLP, Boca Raton, FL, Andrew G. Tolan, Pomerantz, Haudek, Block, Grossman & Gross LLP, New York City, Karl J. Stoecker, Office of Karl J. Stoecker, New York City, Counsel for Plaintiffs.

Paul C. Saunders, Robert H. Baron, Ilana B. Chill, Cravath, Swaine & Moore, New York City, John H. Schmidt, Jr., Lindabury, McCormick & Estabrook, Westfield, NJ, Counsel for Defendants.

LECHNER, District Judge.

This is a consolidated action brought on behalf of purchasers of Lucent Technologies, Inc. ("Lucent") common stock, seeking damages for violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10–b 5, 17 C.F.R. § 240.10b–5, promulgated thereunder. Presently pending is an order to show cause, filed 23 August 2001, (the "Order to Show Cause"), which directed counsel for plaintiffs to submit opposition, if any, to the unsealing of bids submitted by counsel under seal in connection with an auction for appointment as lead counsel in this matter. To date, an objection has been received only from the firm of Bernstein, Litowitz, Berger & Grossman LLP ("Bernstein Litowitz"). For the reasons set forth below, all bids submitted will be unsealed with the exception of that of Bernstein Litowitz. The unsealing of the Bernstein Litowitz bid will be delayed until 26 October 2001 in order to permit Bernstein Litowitz the opportunity to apply for further review of this decision, if so desired.

*Facts* [1]

A. *Procedural History*

Between 7 January 2000 and 2 March 2000, eighteen class action complaints were filed against Lucent, Richard A. McGinn ("McGinn") and Donald K. Peterson ("Peterson").[2] Opinion and Order, dated 17 April 2001, (the "221 F.Supp.2d 472 at 475, 17 April 2001 Opinion"). On 25 February 2000 and 16 March 2000, orders were entered consolidating the *Lucent I* actions. Order, dated 25 February 2000, at 1; Order, dated 16 March 2000, at 1.

By opinion and order, dated 27 April 2000, (the "27 April 2000 Opinion") the Employer–Teamsters Locals 175 & 505 Pension Trust Fund (the "Pension Trust Fund") was appointed provisional lead plaintiff in *Lucent I.* 27 April 2000 Opinion, *In re Lucent Techs., Inc. Sec. Litig.,* 194 F.R.D. 137, 158 (D.N.J.2000). Thereafter, an auction was held and the firm of Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss") was selected as lead counsel. Opinion and Order, dated 2 August 2000 (the "2 August 2000 Opinion"), at 24.

On 3 November 2000, the Pension Trust Fund filed a consolidated and amended class action complaint (the "First Consolidated and Amended Complaint"), alleging a class period from 26 October 1999 through 6 January 2000. First Consolidated and Amended Complaint, ¶ 1.

On 21 November 2000, Lucent issued a press release (the "21 November 2000 Press Release") announcing that it had improperly recognized approximately $125 million in revenue during the fourth quarter of 2000. 17 April 2001 Opinion, 221 F.Supp.2d at 476. Lucent also announced in the 21 November 2000 Press Release that it had reported the revenue recognition issue to the Securities and Exchange Commission. *Id.* at 476.

In the wake of the 21 November 2000 Press Release, a number of other class action complaints were filed against Lucent, McGinn, Henry B. Schacht and Deborah C. Hopkins.[3] *Id.* at 476. It appears

---

**1.** A familiarity with the facts and reasoning of all earlier opinions in this case is presumed.

**2.** The complaints filed between 7 January 2000 and 2 March 2000 are collectively referred to as *"Lucent I"*.

**3.** The suits filed after the 21 November 2000 Press Release are collectively referred to as *"Lucent II"*.

such complaints were based on the 21 November 2000 Press Release. Id.

On 22 November 2000, the Pension Trust Fund filed a second consolidated and amended class action complaint (the "Second Consolidated and Amended Complaint"). *Id.* The Second Consolidated and Amended Complaint extended the class period through 10 October 2000. Second Consolidated and Amended Complaint, ¶ 1.

On 1 December 2000, the Pension Trust Fund filed a third consolidated and amended class action complaint (the "Third Consolidated and Amended Complaint"). 17 April 2001 Opinion, 221 F.Supp.2d at 476. The class period alleged in the Third Consolidated and Amended Complaint was further extended to include the period from 26 October 1999 through 21 November 2000. Third Consolidated and Amended Complaint, ¶ 1.

On 21 December 2000, Lucent issued a press release (the "21 December 2000 Press Release") announcing it would reduce fourth quarter 2000 revenue by an additional $700 million. 17 April 2001 Opinion, 221 F.Supp.2d at 477. As was the case after the 21 November 2000 Press release, several additional class action complaints were filed following the 21 December 2000 Press Release. *Id.*

On 4 January 2001, the Pension Trust Fund filed a fourth consolidated and amended class action complaint (the "Fourth Consolidated and Amended Complaint"). *Id.* at 477. The class period alleged in the Fourth Consolidated and Amended Complaint was further extended to include the period from 26 October 1999 through 21 December 2000. Fourth Consolidated and Amended Complaint, ¶ 1.

On 26 December 2000, an order was entered consolidating the *Lucent II* complaints with the *Lucent I* action (the "26 December 2000 Consolidation Order"). 26 December 2001 Consolidation Order at 2. Thereafter, on 23 January 2001, defendants Lucent, McGinn and Peterson filed an answer to the Fourth Consolidated and Amended Complaint. 17 April 2000 Opinion, 221 F.Supp.2d at 477.

By letter, dated 4 January 2001 (the "First 4 January 2001 Letter"), counsel for Parnassus Income Trust/Equity Income Fund ("Parnassus"), requested that the 26 December 2000 Consolidation Order be vacated. First 4 January 2001 Letter at 1. Likewise, by letter, dated 4 January 2001 (the "Second 4 January 2001 Letter"), counsel for the Anchorage Police & Fire Retirement System and the Louisiana School Employees' Retirement System, also requested that the 26 December 2000 Consolidation Order be vacated. Second 4 January 2001 Letter at 1–2. The two letters were collectively treated as a motion to vacate (the "Motion to Vacate") the 26 December 2000 Consolidation Order. 17 April 2001 Opinion, 221 F.Supp.2d at 475, n. 1.

On 26 January 2001, a conference was held (the "26 January 2001 Conference") to discuss the propriety of vacating the 26 December 2000 Consolidation Order. *Id.* at 477. At the 26 January 2001 Conference, the parties were invited to brief the issue of consolidation. Id. Thereafter, on 9 March 2001, oral argument was conducted.

The Motion to Vacate was denied. *Id.* at 492. Nevertheless, it was determined that additional representation—*i.e.*, an additional lead plaintiff and an additional lead counsel—would benefit the class and provide flexibility, if needed, in the future. *Id.* at 483–84. As a result, Parnassus was appointed to serve as co-lead plaintiff along with the Pension Trust Fund. *Id.* at 488. In addition, it was also determined

that an auction would be held in order to select co-lead counsel to serve with Milberg Weiss. *Id.* at 490.

### B. *Reasons for Bidding and Submissions of Bids Under Seal*

#### 1. *Lucent I*

As mentioned, in Lucent I, the Pension Trust Fund was appointed lead plaintiff by way of the 27 April 2000 Opinion. 194 F.R.D. at 142. In that first motion for appointment of lead plaintiffs, the proposed lead plaintiffs were offered as a group; the group consisted of an institution, the Pension Trust Fund, and two individuals (the "Proposed Lead Plaintiffs"). *Id.* at 142. The Private Securities Litigation Reform Act (the "PSLRA") requires any plaintiff seeking to serve as lead plaintiff to publish a notice of the pendency of the class action (the "Notice of Pendency"). 15 U.S.C. § 78u–4(a)(3)(A).[4] The 27 April 2000 Opinion determined, however, that the Notice of Pendency in Lucent I was inadequate and did not give class members appropriate information. 194 F.R.D. at 148. In reaching that conclusion, it was noted that:

> The situation in this case [*Lucent I*] presents cause for concern, regarding the fact that two individual investors with modest holdings and one institutional investor with moderate holdings were the only class members to apply as representative parties. This may be the result of the inadequacy of the Notice of Pendency.

*Id.* at 148 n. 14. To remedy the situation, a second notification was given to the class

and the Pension Trust Fund was appointed as provisional lead plaintiff. *Id.* at 148, 152.

The motion to appoint the two individual investors as co–lead plaintiffs, however, was denied. *Id.* at 155. It was determined that the individual plaintiffs and the Pension Trust Fund had "failed to demonstrate how they would cooperate efficiently or how the leadership issue would be handled so that control of counsel would be maximized despite the existence of several lead plaintiffs." *Id.* at 152. In appointing only the Pension Trust Fund as lead plaintiff, it was observed that the adequacy of the Pension Trust Fund had not been challenged by any member of the proposed class. *Id.* at 154. The presumption of adequacy created by the PSLRA and attaching to the Pension Trust Fund, therefore, had not been overcome. *Id.* at 153. Nevertheless, the appointment of the Pension Trust Fund was not made final until the second notice of pendency was published and the members of the class had an opportunity to make an informed decision as to whether to seek appointment as lead plaintiff. *Id.* at 155.

Turning to the appointment of lead counsel, it was observed that it was "not possible to determine whether the Proposed Lead Plaintiffs [in Lucent I ] actively sought out and made an informed decision regarding the choice of lead counsel." *Id.* at 156. The Proposed Lead Plaintiffs provided no evidence or indication of a proposed fee arrangement, its terms or discussions or proposals leading up to the signing of such an agreement. *Id.* The

---

**4.** Section 78u–4(a)(3)(A) provides:

Not later than 20 days after the date on which the complaint is filed, the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported class—

(I) of the pendency of the action, the claims asserted therein, and the purported class period; and
(II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class.

Lucent I Proposed Lead Plaintiffs "provided no indication as to how the selection of [p]roposed [l]ead [c]ounsel was arrived at nor what considerations went into the decision." *Id.* Moreover, it appeared "there [was] no indication of whether other counsel were interviewed or even considered." *Id.*[5]

It appeared there was a lack of interest in the lead plaintiff position in *Lucent I.* *Id.* at 151. In addition, there was a failure to provide any information concerning (1) how the group of Proposed Lead Plaintiffs was formed, (2) whether there was a pre-existing relationship among any or all of the Proposed Lead Plaintiffs, and (3) how the group intended to handle communications among its member and with lead counsel. *Id.* at 154. As a result, it appeared the one inference that could be drawn was that the only common point among these plaintiffs was a connection to the proposed lead counsel. *Id.* at 151. Moreover, there was no indication whether each of the Proposed Lead Plaintiffs was aware that it of he was offered as part of a group. *Id.* at 152. Accordingly, it was determined that bidding for lead counsel should occur. *Id.* at 156.

Only three bids were submitted in connection with appointment as lead counsel in *Lucent I.* 2 August 2000 Opinion at 6. These bids considered the substantive aspect of the bid including, *inter alia*, the analysis of the case presented by each bidding counsel, as well as the percentage of the proposed recovery to compensate counsel. *Id.* at 16–23. Milberg Weiss ultimately was awarded the bid. *Id.* at 24.

The 2 August 2000 Opinion was delayed in order to have the benefit of the Circuit's decision in *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir.2000).[6] The 2 August 2000 Opinion recognized the principles laid out in *Gunter* and the fact that the reasonableness of a fee request can be determined only by a review of the facts in each particular case. 2 August 2000 Opinion at 9–10 (quoting *Gunter*, 223 F.3d at 197 n. 1). Specifically, the opinion acknowledged that "the fee schedule bid accepted in this case [*Lucent I* ] is subject to adjustment [because] blind acceptance of a fee percentage from an array of three bids might prove unfair." *Id.* at 10–11 & n. 4. It was recognized that "although a bid ha[d] been accepted[,] the *Gunter* Factors

---

5. See *Lucent I*, 194 F.R.D., 137 et. seq., for a more thorough discussion of the Notice of Pendency, Lead Plaintiff and Lead Counsel dilemma.

6. *Gunter* was decided and filed 27 July 2000 and was relied upon and incorporated into the 2 August 2000 Opinion in *Lucent I.* Significantly, in note 6, the Circuit stated:

> We do note that district courts can avoid many of complications associated with fee awards by setting fee guidelines and ground rules early in the litigation process. . . .
> Another approach is for the district court to determine the fee arrangement in advance through competitive bidding. . . . This device appears to have worked well, and we commend to district judges within this circuit for their consideration.
> *Id.*, 223 F.3d at 201, n. 6. (citations to cases omitted)

Because there were no objections in connection with the proposed bidding process in *Lucent I* and because of footnote 6 in *Gunter*, which recommended a competitive bidding process, the bid process continued. The bids were thoroughly reviewed and the award was made to Milberg Weiss for the reasons set forth in the 2 August 2000 Opinion.

While the 2 August 2000 Opinion cites *Gunter* with regard to the review and approval of an appropriate fee in a class action matter, 2 August Opinion 2000 at 9–10, it appeared there was no reason to discuss the propriety of the use of a bidding process to select lead counsel in a PSLRA case. As mentioned, there were no objections to the use of such a bidding process in this case. Moreover, the Circuit commended the procedure to the District Courts in this Circuit. *Gunter* 223 F.3d at 201 n. 6.

[could] not be considered at [that] point in the litigation." *Id.* at 11–12.

It was explained that:

Although the percentage of fees and expenses to be awarded to lead counsel was considered as an important factor in the analysis [in awarding the bid], the selection of lead counsel [in *Lucent I* ] was made upon consideration of a variety of factors which included—firm experience, firm investment in the matter (time and efforts), the economic ability of the firm to continue its representation through each stage of the litigation, the experience and knowledge of the individual attorneys assigned to the case and importantly, the effectiveness of self-enforcing incentives incorporated into the fee structure of each bid.

*Id.* at 23.

### 2. *Lucent II*

As mentioned, the Motion to Vacate was denied on 17 April 2001. 17 April 2001 Opinion, 221 F.Supp.2d at 492. In reaching this outcome, it was explained "it [did not then] appear that either group [Lucent I or Lucent II ] of plaintiffs ha[d] a 'substantial antagonism toward the positions of other[s] in the class.' " *Id.* at 483 (quoting *In re PHLCORP Sec. Litig.*, No. 88–0306, 1989 WL 251578, at *2 (S.D.N.Y. 10 Nov. 1989)). Furthermore, it was determined that any asserted conflict between the plaintiffs in Lucent I and Lucent II was theoretical and that sub-classes were not necessary. *Id.* at 483.

Of the institutional plaintiffs expressing a willingness to serve as lead plaintiff in Lucent II, Parnassus, was selected to serve that role. *Id.* at 487–92. Notwithstanding the observations in *Lucent I* regarding the deficiencies of the Proposed Lead Plaintiffs, with regard to the formation or proposed organization or workings of the proposed lead plaintiffs group, *see* 194 F.R.D. at 154, the institutional plaintiffs in *Lucent II* seeking appointment as lead plaintiff as a group did "not describe how their group was formed, whether there was a pre-existing relationship among any of its members or how they plann[ed] on handling communication among the group and lead counsel." 17 April 2001 Opinion, 221 F.Supp.2d at 487.

As mentioned, of the proposed lead plaintiffs in *Lucent II*, Parnassus was selected. It was determined that none of the other proposed lead plaintiffs offered a superior ability, vis-a-vis Parnassus, to handle lead counsel or manage the action. *Id.* at 487. Moreover, the alleged losses of Parnassus were greater than any of the other proposed lead plaintiffs. *Id.* at 488. It was also determined that the appointment of more than one co-lead plaintiff to join with the Pension Trust Fund, appointed in *Lucent I*, offered no additional benefits. *Id.* Accordingly, Parnassus was deemed the most capable of adequately representing the interests of the class members. *Id.* at 488.

It was further determined that an additional lead counsel would be of assistance in representing the plaintiffs in *Lucent II* and that "additional representation may benefit the class and provide flexibility, if needed, in the future." April 2001 Opinion, 221 F.Supp.2d at 488. As with the Pension Trust Fund in *Lucent I*, Parnassus did not provide any evidence or indication of a proposed fee arrangement, its terms or discussions or proposals leading up to the arrangement. *Id.* at 489. Parnassus explained neither how it selected proposed lead counsel nor the considerations that went into the decision. *Id.* As with *Lucent I*, there was no indication as to whether other counsel were interviewed or even considered. *Id.*

Again, because there was no objection expressed to a proposed bid process to

select co-lead counsel in *Lucent II*, and in light of the decision in *In Re Cendant Corp. PRIDES Litig.*, 243 F.3d 722 (3d Cir.2001)[7] and in light of the absence of objections in *Lucent I*[8] and the comments of the Circuit in note 6 in *Gunter*, 223 F.3d at 201 n. 6, bids were solicited in order to select lead counsel for the plaintiffs in Lucent II. *Id.* at 489–91. It was reiterated in *Lucent II* that:

> [T]he proposed bids are to be submitted under seal so as to mitigate against the possibility of collusion and maintain the confidentiality of attorney work product to the extent such as revealed in a bid. As was the case with the previous sealed bid auction, the fee proposals and data of the successful and unsuccessful firm will not be sealed.

*Id.* at 491. Accordingly, while counsel submitted the bids under seal, an order sealing the bids was not issued.

The 12 June 2001 Opinion (the "12 June 2001 Opinion") was filed under seal. Transmission of a copy to defense counsel was delayed for approximately ten days in order to permit counsel for plaintiff the opportunity to alert the court to any disclosure of data asserted to be work product contained in their bids. 12 June 2001 Opinion at 3 n. 1. Because no such notification was received, the 12 June 2001 Opinion was unsealed and mailed to defense counsel shortly thereafter.

The 12 June 2001 Opinion reviewed seventeen bids that were received from various counsel.[9] *Id.* at 12–41. As with *Lucent I*, it was recognized that the court would not be bound by the bidding process. *Id.* at 12. In this regard, it was stated that "although the results of a bidding process may be of use to a court in awarding fees at the end of the case, it cannot supplant post-judgment analysis to determine a reasonable fee." Id. (quoting *In re Cendant PRIDES*, 243 F.3d at 735 n. 18). In selecting co-lead counsel, the bid of each of the seventeen bidders was thoroughly examined. *Id.* at 12–41.

Although Parnassus proposed Cohen Milstein as co-lead counsel, *id.* at 33, it indicated that it was also comfortable with Bernstein Litowitz serving as co-lead counsel. *Id.* at 39. Parnassus expressed this position in two certifications of the President of Parnassus, Jerome Dodson. *Id.* In each, Dodson expressed his comfort with Bernstein Litowitz or his willingness to work with the firm. *Id.* As mentioned, the bid was awarded to Bernstein Litowitz, for the reasons expressed in the 12 June 2001 Opinion. *Id.* at 37–41.

---

7. In *In re Cendant PRIDES*, 243 F.3d at 732 was filed on 21 March 2001. It concerned a fee award in a PSLRA case. Lead Counsel were appointed by the District Court pursuant to a bidding process. *Id.* at 726, 731. While discussion concerned the fee award of the District Court, there was no criticism of the use of a bidding process to select lead counsel.

In a 28 August 2001 decision, the Circuit in *In re Cendant Corporation Litigation*, 264 F.3d 201 (3d Cir.2001) distinguished *Cendant PRIDES*. *Id.* at 221. It noted the decision to use an auction to appoint lead counsel was not challenged on appeal. It observed that "[o]nce the use of an auction was accepted, *Cendant PRIDES* ceased to be a typical PSLRA case...." *Id.* at 284 n. 56.

8. The bids in *Lucent I* were submitted under seal in order to prevent possible collusion and to maintain the confidentiality of a attorney work product to the extent it was revealed in the bidding process. The fee proposals of both the successful and unsuccessful firm, however, were not sealed by order of the court. 17 April 2001 Opinion, 221 F.Supp.2d at 490.

9. As explained, in *Lucent I* only three bids were received. Accordingly, the seventeen bids that were received in *Lucent II* provided an opportunity to consider "market value" with regard to the proposed services of counsel.

C. *The Auction and In re Cendant Corp. Litig.*

In *In re Cendant,* the Circuit, on 28 August 2001 issued an extensive opinion. The opinion addressed, among other things, the award of counsel fees and the use of bidding to select lead counsel. 264 F.3d at 269–86.

Regarding bid auctions for the selection of lead counsel, the Circuit stated that "[a]lthough we believe there are situations under which the PSLRA would permit a court to employ the auction technique, this [*In re Cendant*] was not one of them." *Id.* at 219. This latest *Cendant* opinion cited to *In re Cendant,* 260 F.3d 183 (3d Cir.2001), where the Circuit determined that the District Court, by directing that the bids for the auction be submitted under seal, had "abused its discretion by imposing such a confidentiality order." *In re Cendant,* 264 F.3d at 225 n. 6 (quoting *Cendant,* 260 F.3d at 196 n. 6). As indicated in *Lucent I* and *Lucent II,* although the bids were to be submitted by counsel under seal to obviate any possible collusion, no sealing order was entered. *See Lucent I,* 194 F.R.D. at 153; 12 June 2001 Opinion at 3 n. 1. As well, counsel were advised that the data in the bids would be unsealed. *Id.*

The use of the bidding process in *Lucent I* and *Lucent II* was determined to be appropriate because of the facts surrounding the lack of interest in *Lucent I* with regard to the lead plaintiff position, as well as the lack of any opposition to such a process. 17 April 2001 Opinion, 221 F.Supp.2d at 489–91. As well, before lead counsel were selected in *Lucent I,* the Circuit issued *Gunter,* in which it "recognized the potential benefits of the auction method, commending it to the District Courts in this Circuit for their consideration as one potential approach to the problems in this area." *In re Cendant,*

264 F.3d at 258 (quoting *Gunter,* 223 F.3d at 201 n. 6.)

The auction process was used to select lead counsel in *Lucent II.* Again, no objection was offered to the use of an auction, *Gunter* commended it to the judges in this Circuit, and *Cendant PRIDES* considered counsel fees in a PSLRA case which used an auction but did not criticize the use of such an auction. *In re Cendant PRIDES,* 243 F.3d at 726, 731. All of this lead to the conclusion that the use of a bidding process was an acceptable approach.

Clearly, in *In re Cendant,* the Circuit distinguished *Gunter* as an anti-trust case and explained that the compatibility of the auction procedure with the PSLRA was not before the Circuit in *Gunter. Id.* at 259 n. 39. While the *In re Cendant* opinion, and note 39 in particular, separate the appropriateness of auctions for use in a PSLRA case, these observations were not available prior to 28 August 2001.

In point of fact, note 6 in *Gunter* not only addressed the existence of another approach, but cited to several PSLRA cases in which it was used. *Gunter,* 223 F.3d at 201 n. 6. In note 6, the Circuit observed that "this device appears to have worked well and we commend it to District Judges within the Circuit for their consideration." *Id.* As well, the auction approach was not criticized in *Cendant PRIDES,* a PSLRA case. Accordingly, as explained, it appeared such a procedure was appropriate for use in this Circuit. In the wake of the most recent opinion in *In re Cendant,* 264 F.3d 201, this is clearly no longer the case. Nevertheless, the aforementioned reasons are why bidding was used in *Lucent I* and *Lucent II.*

Because it would be difficult to award a bid and determine the fee arrangement in advance without performing a cost-benefit and quality analysis as would a client in a real-world situation, the bids requested in

*Lucent I* and *Lucent II* required more than simply a proposed fee percentage. In *In re Cendant*, the Circuit indicated that "an auction is not generally permissible in a [PSLRA] case, at least as a matter of first resort." 264 F.3d at 273. In *Lucent I*, there was nothing in the submissions to illustrate the basis used by the Proposed Lead Plaintiffs for the selection of proposed lead counsel, or even the consideration of other counsel. *Lucent I*, 194 F.R.D. at 150. Moreover, nothing was offered with regard to a fee agreement, how it was arrived at or the method of negotiation, if any. *Id.* It appeared the only common thread among the proposed lead plaintiffs was proposed lead counsel. *Id.*

Because Lucent was, at the time, considered to be investment grade, it was presumed that there would have been more interest in the proposed lead plaintiff position and, therefore, more possible proposed lead counsel. As the Circuit in *In re Cendant* explained, "the question is whether judicial intervention is necessary to protect the interests of the plaintiff class." 264 F.3d at 274 (internal citation omitted). This was, in fact, part of the reasoning behind the use of an auction in *Lucent I*. Again, in light of *Gunter*, the absence of objections in *Lucent I* and the absence of objections in *Lucent II* (and for consistency) and the decision in *Cendant PRIDES*, the bidding process was used in *Lucent II*.

As the Circuit further explained "the ultimate inquiry is always whether the lead plaintiff's choices were the result of a good faith selection and negotiation process and were arrived at via meaningful arms-length bargaining." *In re Cendant*, 264 F.3d at 276 (citing *In re Nice Sys. Sec. Litig.*, 188 F.R.D. 206, 223 (D.N.J.1999)). Significantly, as a result of the bidding process in *Lucent I* and *Lucent II*, the lead counsel selected were the lead counsel proposed by the lead plaintiffs.

### D. *The Unsealing of the Auction Bids*

It was explained that the fee proposals and data of the successful and unsuccessful firms would not remain sealed. 17 April 2001 Opinion, 221 F.Supp.2d at 490–91. As well, the fee proposal of Milberg Weiss was referred to during oral argument on the Motion to Vacate. Nevertheless, in an abundance of caution and in recognition of the detailed bids submitted by so many of the bidding counsel, particularly that of Bernstein Litowitz, the bids submitted by counsel under seal have not been opened in order to give counsel an opportunity to object to any included information.

As indicated, the only objection submitted was that of Bernstein Litowitz, and that objection was only with regard to section 5.D of its bid. 10 September 2001 Letter, submitted by Bernstein Litowitz, (the "Bernstein Litowitz Letter") at 1. It is asserted that section 5.D of the Bernstein Litowitz bid "provides a detailed analysis of the damages suffered by purchasers of Lucent Common Stock between July 20, 2000 and December 21, 2000 and an assessment of Lucent's ability to pay a judgement in this action." *Id.* at 1–2.

Bernstein Litowitz argues that this section "constitutes attorney work product and that disclosure of the information contained in this section at this time will prejudice lead plaintiffs and the class." *Id.* at 2. Counsel, however, were cautioned twice in the 17 April 2001 Opinion that the fee proposals and data of the successful and unsuccessful firms would not be sealed. *Id.* at 490–91. Bernstein Litowitz, as well as other counsel bidding for the position of lead counsel, therefore, had been fully and fairly advised that any information contained in the bids would be

disclosed. By nonetheless including, what is now asserted as attorney-work product in the bid, Bernstein Litowitz effectively waived a claim of privilege in regard to that material.

Because Bernstein Litowitz included the asserted work product data in the bid with full knowledge that the contents of the bid would be made public, any claim of work product has been waived. The unsealing of Section 5.D of this bid, however, will be delayed until 22 October 2001 in order to permit Bernstein Litowitz the opportunity to seek further review, if so desired.